**In re RALLY PARTNERS, L.P., Rally Pipeline Corporation, Rally Pipeline Marketing Co., Debtors.**

Nos. 01–61988, 01–61989, 01–61987.

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

Sept. 30, 2003.

William Sheehy, Wilson, Sheehy, Knowles, Robertson & Cornelius, P.C., Tyler, TX, for Rally Partners, L.P., Reorganized Debtor.

J. Robin Lindley, Buck, Keenan & Gage, L.L.P., Houston, TX, and Michael E. Gazette, Law Offices of Michael Gazette, Tyler, TX, for Claimants, Gulf South Pipeline Co., L.P. and Koch Midstream Service Co., L.L.P.

### *MEMORANDUM OF DECISION*

BILL PARKER, Chief Judge.

This matter is before the Court to consider the objections filed by Rally Partners, L.P. (the "Debtor"), to two proofs of claim filed in the Debtor's Chapter 11 proceeding: one by Koch Midstream Services Company, L.L.C. ("Koch"), and a second proof of claim filed by Gulf South Pipeline Company, L.P. ("Gulf South") (collectively, the "Creditors"). At the conclusion of a consolidated hearing on the objections, the parties were provided with the opportunity to submit supplemental briefing and, upon receipt of such briefing, the Court took the matters under advisement. This memorandum of decision disposes of all issues pending before the Court.[1]

### *Background*

On December 5, 2001, Gulf South filed unsecured claim #16 in the amount of $2,109,383.36. Gulf South owns and operates an interstate natural gas pipeline system, and is duly authorized to engage in business as an open access interstate natural gas pipeline operator regulated by the Federal Energy Regulatory Commission ("FERC"). Prior to the filing of this bankruptcy, the Debtor was engaged in the natural gas trading business and fre-

---

1. This Court has jurisdiction to consider the objections pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). The Court has the authority to enter a final order in these contested matters since they each constitute a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (B), and (O).

quently shipped gas on the Gulf South pipeline system. The relationship between Gulf South and the Debtor was subject to the terms and conditions of several contracts, and was also subject to the terms of Gulf South's FERC Gas Tariff. This FERC Tariff included procedures for resolving imbalances which occur when the physical volume of gas actually delivered into the system by a shipper differs from the physical volume of gas delivered out of the system for the shipper's account in accordance with nominations provided by the shipper.[2] Under the imbalance resolution procedures, the Debtor could eliminate its end-of-month imbalances by either offsetting its imbalances against opposite imbalances of other shippers, or by using the "Cash Settlement" procedure.

The parties have stipulated that from March 2001 until August 2001, the Debtor had an imbalance on Gulf South's pipeline system where it was "short" or "overdelivered;" hence, the Debtor had delivered less gas into the Gulf South pipeline system than had been shipped on the Debtor's behalf. It is also undisputed that the Debtor did not resolve these imbalances by offsetting any opposite imbalances. Accordingly, pursuant to the terms of the "Cash Settlement" procedure, Gulf South sent invoices to the Debtor in order for the Debtor to cure the imbalances. These invoices included an "Index Price" for the

actual quantity of gas delivered on behalf of the Debtor,[3] multiplied by a "Factor" as set forth in the FERC Tariff.[4] The parties have stipulated that: (1) the imbalance invoices reflect the volumes of gas delivered by Gulf South attributed to the Debtor's account in excess of the volumes of gas actually injected into the system by the Debtor; (2) that Gulf South correctly calculated the imbalances in accordance with the terms of the contracts and the FERC Tariff; and (3) that these invoices remain unpaid. The only objection raised by the Debtor to Gulf South's $2,109,383.36 claim is whether Gulf South is entitled to recover the $147,789.00 which was added to the Index Price by applying the Factor set forth in the FERC Tariff, or whether the application of the Factor constitutes an improper penalty.

Similarly, on the same date that Gulf South filed claim # 16, Koch filed its unsecured claim # 14 in the amount of $757,689.48. Koch also owns and operates a natural gas pipeline system which the Debtor frequently used prior to its bankruptcy; however, Koch's pipeline system, as an intrastate system located throughout East Texas, is not subject to any FERC Tariff. The relationship between Koch and the Debtor is subject to the terms and conditions of an Interruptible Gas Gathering Agreement dated May 1, 2000, and various exhibits thereto (collectively, the

---

2. The term "nominate" in this context means to designate volumes of gas for transportation and/or sale. Nominations are virtually always estimates since actual production volumes are not typically known until some weeks, if not months, after the actual production.

3. This Index Price is based upon the average of index prices published in *Natural Gas Week* for areas in Texas and Louisiana.

4. This "Factor" depends on the percentage of the imbalance created when the amount of gas shipped by Gulf South on behalf of the

Debtor exceeds the amount of gas actually delivered into the Gulf South pipeline system by the Debtor, and varies from 1.0 to 1.50. The Factor utilized by the FERC Tariff is 1.0 if the imbalance amount is less than 10%; hence, the Factor does not have any real effect. If the imbalance amount exceeds 10% but is less than 15%, then the Factor is 1.25. Finally, if the imbalance amount exceeds 15%, then the Index Price must be multiplied by a Factor of 1.50 to determine the actual amount owed to Gulf South as a result of the imbalance.

"Koch Agreement"). The Koch Agreement also provides procedures for resolving imbalances.[5] From June 2001 through August 2001, the Debtor had an imbalance on Koch's pipeline system where it was "short" on injections or "over-delivered," causing Koch to send imbalance invoices to the Debtor. The parties have agreed that these invoices were correctly calculated under the terms of the Koch Agreement, and that the Debtor has not paid any of these invoices. As in the objection to the Gulf South claim, the only objection to Koch's $757,689.48 claim is whether Koch is entitled to recover $111,473.00 which was added to the Index Price by applying the Imbalance Price of 120%, as set forth in the Koch Agreement, or whether the application of this percentage factor constitutes an improper penalty.

### Discussion

■ A proof of claim, if it is executed and filed in accordance with the Federal Rules of Bankruptcy Procedure, constitutes *prima facie* evidence of the validity and amount of that claim, FED. R. BANKR. P. 3001(f), and is deemed allowed unless a party in interest objects under 11 U.S.C. § 502(a). A proof of claim, however, does not qualify for that *prima facie* evidentiary effect if it is not executed and filed in accordance with the Bankruptcy Rules. *See First Nat'l Bank of Fayetteville v. Circle J. Dairy (In re Circle J Dairy, Inc.),* 112 B.R. 297, 300 (W.D.Ark.1989). Rule 3001 generally sets forth the requirements for filing a proof of claim, and one of those requirements states that:

when a claim ... is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

FED. R. BANKR.P. 3001(c).

Likewise, if a creditor claims a security interest in property of the debtor, Rule 3001(d) requires the creditor to accompany its proof of claim with evidence that the creditor perfected a security interest.

■ Hence, the burden of persuasion under the bankruptcy claims procedure always lies with the claimant, who must comply with FED. R. BANKR. P. 3001 by alleging facts in the proof of claim that are sufficient to support the claim. If the claimant satisfies these requirements, the burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. *See Lundell v. Anchor Const. Specialists, Inc. (In re Lundell),* 223 F.3d 1035, 1041 (9th Cir. 2000); *Sherman v. Novak (In re Reilly),* 245 B.R. 768, 773 (2d Cir. BAP 2000). This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, *see In re Lenz,* 110 B.R. 523, 525 (D.Colo.1990); by the presentation of legal arguments based upon the contents of the claim and its

5. The Koch Agreement, unlike Gulf South's FERC Tariff, does not allow a shipper, *e.g.* the Debtor, to offset its imbalances with opposite imbalances of other shippers. Under the procedures set forth in the Koch Agreement, a delivery of gas into the Koch pipeline system which is less than the amount nominated by the Debtor and subsequently shipped out of the system on the Debtor's behalf is also multiplied by an "Imbalance Price" according to

the percentage of the imbalance. If the imbalance is less than or equal to 5%, then the Imbalance Price is 100% of the Cashout Index Price. If the imbalance is greater than 5% but less than or equal to 10%, then the Imbalance Price is 110% of the Cashout Index Price. Finally, if the imbalance is greater than 10%, then the Imbalance Price is 120% of the Cashout Index Price.

supporting documents, *see In re Circle J Dairy,* 112 B.R. at 300; or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question, *see In re Frontier Airlines, Inc.,* 112 B.R. 395, 399–400 (D.Colo.1990). If the objecting party meets these evidentiary requirements, then the burden of going forward with the evidence shifts back to the claimant to sustain its ultimate burden of persuasion to establish the validity and amount of the claim by a preponderance of the evidence. *See In re Consumers Realty & Development Co.,* 238 B.R. 418 (8th Cir. BAP 1999); *In re Allegheny International, Inc.,* 954 F.2d 167, 173–74 (3d Cir.1992). If, however, the claimant fails to allege facts in the proof of claim that are sufficient to support the claim, *e.g.,* by failing to attach sufficient documentation to comply with FED. R. BANKR.P. 3001(c), the claim is not automatically disallowed; rather, it is merely deprived of any *prima facie* validity which it could otherwise have obtained. *See In re Los Angeles Int'l Airport Hotel Assoc.,* 196 B.R. 134, 139 (9th Cir. BAP 1996).

■ In the present case, Koch filed its claim # 14 in compliance with the Federal Rules of Bankruptcy Procedure; hence, its claim is entitled to *prima facie* validity. Thereafter, the Debtor properly objected to claim # 14 by presenting legal argument based upon the validity of a claim containing a "penalty."[6] Consequently, the burden of going forward with the evidence shifted back to Koch to sustain its ultimate burden of persuasion to establish, by a preponderance of the evidence, the validity of its claim to the disputed

$111,473. *See Consumers Realty,* 238 B.R. 418; *Allegheny,* 954 F.2d at 173–74.

■ Gulf South, on the other hand, failed to attach any supporting documentation to its claim # 16; thereby depriving it of any *prima facie* validity. However, at the February 13, 2003, hearing, the parties stipulated that Gulf South's $2,109,383.36 claim was valid and correctly calculated, pending the Court's ruling on the Debtor's limited objection to $147,789 of such claim as being in the nature of a penalty. Accordingly, based upon this limited objection to Gulf South's claim by the Debtor, Gulf South must also carry the ultimate burden of persuasion to establish the validity of its claim to the disputed $147,789.

The sole argument relied upon by the Debtor in its objection to the two proofs of claim is that the imbalance resolution procedures contained in both the Koch Agreement and in Gulf South's FERC Tariff, which requires the average Index Price to be multiplied by what the claimants call an "Imbalance Price" or a "Factor,"[7] impose a penalty upon the Debtor which, if allowed, would serve only to punish the other unsecured creditors. Hence, the Debtor argues that these "penalty" amounts must be disallowed. The Creditors, on the other hand, assert that these contractual provisions cannot be properly construed as the imposition of a penalty and that there is no policy reason compelling the disallowance of the claimed amounts. Accordingly, the Court must determine whether the imbalance resolution procedures contained in both the Koch Agreement and in Gulf South's FERC Tariff impose a "penalty" upon the Debtor.

---

6. As mentioned earlier, the Debtor only objects to $111,473 of Koch's $757,689.48 claim based upon the Debtor's characterization of that $111,473 as a "penalty."

7. Gulf South's FERC Tariff uses the term "Factor," while the Koch Agreement calls this multiplier an "Imbalance Price."

Black's Law Dictionary defines "penalty" as "[e]xcessive liquidated damages that a contract purports to impose *on a party that breaches*," and as a "[p]unishment imposed *on a wrongdoer*, especially in the form of imprisonment or fine." *See* BLACK'S LAW DICTIONARY 1153 (7th Ed.1999) (emphasis added); *see also U.S. v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224, 116 S.Ct. 2106, 2113, 135 L.Ed.2d 506 (1996) ["(I)f the concept of penalty means anything, it means punishment for an unlawful act or omission."].

■ In the bankruptcy context, it is well accepted that

> [p]enalties are not in harmony with the overall philosophy of the Bankruptcy Code which is to effectuate a fair and equitable distribution of the assets of the estate to creditors. A penalty is discordant with this philosophy because it serves the function of preferring one creditor at a detriment to other creditors of the estate. A bankruptcy court is essentially a court of equity and will therefore not enforce a penalty.

*In re Stewart*, 190 B.R. 846, 851–52 (Bankr.C.D.Ill.1996) (citations and quotations omitted). This principle has arisen most often in the context of the treatment of punitive damage claims in mass tort bankruptcy cases. *See, e.g., In re Hillsborough Holdings Corp.*, 218 B.R. 617, 620 (Bankr.M.D.Fla.1991) [sustaining debtor's objection to portion of judgment creditor's proof of claim reflecting punitive damages awarded in prior state court lawsuit because allowance of the punitive damages "would serve more to punish unsecured creditors than it would to punish the debtor"]; *In re Johns–Manville Corp.*, 68 B.R. 618, 627 (Bankr.S.D.N.Y.1986) ["The pur-

pose of punitive damages . . . is to punish tortfeasors and deter them from their wrongful conduct. . . . Neither purpose would be served by permitting the recovery of punitive damages in this reorganization."]. This protection for creditors was also recognized under the old Bankruptcy Act. *Matter of GAC Corp.*, 681 F.2d 1295, 1301 (11th Cir.1982) [affirming a bankruptcy court's determination that punitive damage claims "are not appropriate in the bankruptcy context because the rationale for punitive damages is to punish the wrongdoer, whereas allowing such claims in bankruptcy would have the effect of punishing innocent third parties, i.e., the other creditors . . . ."]. But it can arise in traditional contractual disputes as well, and "[e]lements of damages which are classified as penalties, such as late charges which *excessively* compensate an obligee to an executory contract beyond its actual damages, are unenforceable." *In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 425 (Bankr.E.D.Pa.1991)(emphasis added).

■ However, these various concerns are simply not present in the current case. The imbalance resolution provisions contained in the Koch Agreement and in Gulf South's FERC Tariff do not fit within the traditional definition of a "penalty" because these contractual provisions are not intended to apply to "a party that breaches" or to "a wrongdoer." Rather, both the Koch Agreement and Gulf South's FERC Tariff recognize that variations between the nominated amount and the actual amount of gas delivered into the respective pipeline systems are ordinary and customary in the gas industry due to the difficulty in precisely estimating the amount of gas available for a shipper (*e.g.*, the Debtor) to ship during any given period.[8] In recog-

---

8. "Imbalances have always been present in the industry due to the physical properties of natural gas. Producers cannot guarantee

with absolute certainty that a specific volume of gas will be produced from a given well for a particular time period." Dean C. Maschoff

nizing that the creation of such imbalances is a common, everyday event which occurs in the industry, and by providing various methods by which the gas shippers can cure such imbalances,[9] both the Koch Agreement and Gulf South's FERC Tariff make it clear that it is not a breach of contract for an imbalance to occur, nor does the existence of an imbalance constitute any evidence of wrongdoing. These provisions simply recognize that the nomination process is inherently speculative. Because the "Imbalance Price" and the "Factor" provisions are not invoked by a wrongful act, nor are they intended to act as a disincentive against, nor a punishment for, an act of wrongdoing, they do not constitute "penalty" provisions in the traditional sense. *See, e.g., Kirby v. U.S.*, 260 U.S. 423, 427, 43 S.Ct. 144, 145, 67 L.Ed. 329 (1922) [holding that a payment provision was neither a penalty nor a liquidated damage clause because it was not to be paid in the case of a breach of contract]; *Blanchard and Co., Inc. v. Heritage Capital Corp.*, No. Civ. A.3:97–CV–0690–H, 1998 WL 597160, *3 (N.D.Tex. Aug.26, 1998) ["Prior to reaching the question of whether a contractual provision is indeed a penalty or merely a liquidated damages clause, the Court must make the threshold determination of whether the provision in question is triggered by a breach of contract."]; *B.F. Saul Real Estate Invest. Trust v. McGovern*, 683 S.W.2d 531, 534 (Tex.App.-El Paso 1984, no writ) ["The whole subject of penalty versus liquidated damages only arises when the parties to a contract have attempted to provide for a remedial right upon breach of a contract."].

Nor does the allowance of these portions of the Creditors' claims based upon the "Imbalance Price" or the "Factor," respectively, conflict with the overall philosophy of the Bankruptcy Code to effectuate a fair and equitable distribution of the assets of the estate to creditors. The policy concerns which have often mandated the disallowance of punitive damage claims are simply inapplicable to these claim elements.[10] As previously stated, these contractual provisions are not intended to punish or to deter the Debtor. They serve a reasonable business function in the context of this industry to address the anticipated circumstance in which a shipper is

---

and Terry G. Palmberg, *Gas Imbalances: A Growing Problem*, Pub. Util. Fort., October 26, 1989, at 24.

9. As mentioned previously, the imbalance resolution procedures contained in the FERC Tariff allow the Debtor to eliminate its end-of-month imbalances by either offsetting its imbalances against opposite imbalances of other shippers, or by using the "Cash Settlement" procedure. The imbalance resolution procedures in the Koch Agreement require the Debtor to eliminate any "under-delivered" imbalance by purchasing from Koch the requisite amount of gas necessary to cure the imbalance.

10. The Debtor's reliance upon *In re Apex Oil Co.*, 118 B.R. 683 (Bankr.E.D.Mo.1990) and *Waterfield Mortg. Co. v. Clark (In re Clark)*, 31 B.R. 502 (Bankr.S.D.Ohio 1983) is misplaced and those cases do not alter the Court's conclusion. Unlike the circumstances in *Apex Oil*, the debtor in the present case is not faced with "hundreds of millions of dollars in punitive or exemplary damages or fines, penalties, or forfeitures that have been asserted by hundreds, if not thousands, of claimants," nor are the amounts of the asserted claims in the present case unliquidated or incapable of realistic estimation. The asserted claims did not preclude the confirmation of the Chapter 11 plan in this case, nor are they, in fact, particularly significant when compared to the total claims in this case. Similarly, the "general rule" announced by the *Waterfield* court—that the Court "will not permit the enforcement of contractual penalty provisions ... for '*breaches*' resulting solely from delays in Chapter 13 administration," *id.* at 505 (emphasis added)—is clearly distinguishable from the current dispute.

unable to deliver the amount of gas which it had earlier nominated for delivery, but for which it has already received credit. The additional liability imposed by each contract is proportional to the degree to which the shipper's delivery is imbalanced and, under the FERC Tariff agreement, is imposed in this circumstance only because the Debtor has failed and/or refused to utilize alternative means by which to address the imbalance. There is no evidence in the record to support the supposition that the formulas invoked by these imbalance resolution provisions are inordinately high or can otherwise be characterized as irregular or unusual for this industry.

Because the enforcement of these contractual provisions do not trigger nor violate the policies for which claims have been legitimately denied or subordinated in other bankruptcy cases as an unenforceable penalty, the Court concludes that the allowance of the $147,789.00 element of Gulf South's claim and the $111,473.00 element of Koch's claim, each arising from the invocation of the imbalance resolution provisions contained in their respective contracts with the Debtor, is appropriate and that the Debtor's objections relating thereto must be overruled.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law [11] pursuant to Fed.R.Civ.P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr.P. 7052 and 9014. Separate orders will be entered which is consistent with this opinion.

---

11. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.